[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] ARTICULATION IN SUPPORT OF ORDER NOVEMBER 25, 1998 
CT Page 432 MEMORANDUM OF DECISION
On July 11, 1997, the two minor children were committed to the care and custody of DCF. On May 27, 1998, that commitment was extended until further order of the Court without prejudice to Melissa G. or John G., Sr. who entered denials to the petition. A trial on the merits was held on October 30, 1998 and subsequent days until November 25, 1998, when the following order was entered:
Custody of John, Jr. is transferred to his mother, Sue Ann H. of Rhode Island, effective Monday, November 30, 1998 at noon. Father shall have visitation with his son, John, supervised by Rhode Island Department of Children and Families, two times per week totaling three hours per week. (This order is modified by this Articulation. See page 8.)
Custody of Daniel M. is not changed, and it is extended in DCF for a period not to exceed twelve months. Efforts to reunite Daniel with mother are to continue.
Articulation:
Melissa G. is the mother of Daniel M., age 3 years, 4 months (hereinafter "Danny"). John, Sr. is the father of John, Jr., age 4 years, 8 months (hereinafter "Johnny"). Sue Ann H. is the mother of Johnny and resides in Rhode Island. Melissa G. and John, Sr. are married and together they are parents of Jarrett who has been diagnosed with CP and who is not a subject of this action. Until May 28, 1997, Danny and Johnny lived with Melissa and John, Sr.
On May 21, 1997, DCF received an anonymous call reporting observed injury on the face of Danny, age 22 months, which mother reported to be the result of his falling from his crib. The caller was incredulous. DCF already had an open protective services file on this family resulting from the same Danny being taken to the hospital on February 15, 1997 with a second degree bun on his hand and "splash burns" on his legs. A healing clavicle fracture was noted in x-rays. This fracture was found to be consistent with the explanation of an accidental fall and the burns were consistent with the explanation that Johnny had turned on the hot water in the bathtub while Danny was in it and was quickly rescued by John, Sr. who was the sole care taker at the CT Page 433 time of the burn in injury.
DCF immediately investigated the May 21 referral with the assistance of the state police. Melissa explained that Danny had fallen out of his crib while Melissa and John, Sr. were in bed. They heard the sound of the fall. She found his face red, his lip swollen, and he was bleeding form the nose. She did not seek medical attention since she was not concerned about broken bones. The children were at Danny's maternal grandmother's home and DCF investigators and the police officer went there to view the child. They found that Daniel had significant swelling and bruising under his right eye and on his right cheekbone, a small amount of dried blood in his left nostril and the left side of his lip was swollen with what appeared to be broken blood vessels. There were five round bruises on his chest. Photographs taken shortly after this at the hospital reveal the extent of this significant injury. (State's exhibit 3A, 3B, 3C, 3D.) That night Melissa and John, at the request of DCF, voluntarily placed the children with Daniel's maternal grandmother.
On May 22, 1997, both children were examined by Garfield Danenhower, M.D., at the request of DCF. Prior to the arrival of a DCF worker at the doctor's office, Melissa had explained to Dr. Danenhower that John, Sr. was caring for the children while Melissa was not there and that Danny had fallen from the bathtub hitting his face on the floor. Maternal grandmother expressed concern that every time Danny gets hurt, John, Sr. is the sole caretaker. Dr. Danenhower found small bruises in the chest area which Melissa explained as having been incurred several day ago in a fall. Dr. Danenhower indicated to DCF that Daniel's injuries could not be supported medically by the explanations given by Melissa.
The children were presented to Betty Spivack, M.D. at the Connecticut Children's Medical Center for examination. Her findings are significant. They were refuted neither by any clinical nor forensic evidence at trial, but only denied by the parties at interest. A letter to DCF dated May 23, 1997 from Dr. Spivack reads as follows [substituting Melissa where Dr. Spivack indicates mother's name and John, Sr. where she indicates step father's name]:
Thank you for your referral concerning Daniel M . . . (DOB 8/26/95) and his half-brother, John [Jr.] (DOB 5/25/94). As you know, I became involved with Daniel in February of this CT Page 434 year, when there had been a previous referral regarding a burn he sustained while in the care of his father {sic}. The injury was a splash burn which matched the history provided at the time. A skeletal survey revealed only a healing clavicle fracture, a very common fracture in a mobile toddler, and one which can have little in the way of symptoms other than local tenderness and swelling at the site, which can often be attributed to the local bruising. No history was provided for this injury. At the time I was unable to definitively say that either injury was caused by abuse, only that the burns were splash burns, matching the history provided. Certainly such injuries can be caused by abuse.
 A new report was received by you on May 21, 1997 alleging facial bruising on Daniel. You indicated that [Melissa] told you that Daniel had fallen from the crib, and even showed you the crib and how the injury occurred. Her husband told you separately (without knowing her story) that it happened when Daniel got out of the bathtub while he was caring for him. I arranged to see Daniel and his brother John [Jr.] at the CCMC Emergency Department in the alternoon of May 22, 1997. I saw both children in your presence, and with [Melissa] present; [John, Sr.] was not present. [Melissa] admitted to me that she initially had lied about the cause of the injury, stating she was afraid that her kids would be taken away if Daniel had again been injured while in the care of her husband. She said that the injury had occurred on May 20, 1997 while she was not home, and her husband had told her that Daniel had fallen while getting out of the tub. She identified the bruises on Daniel's chest (see below) as 3-4 days old, and caused by falling.
I examined both children. Daniel is a well-grown, well-developed 21 mouth-old with appropriate social skills. He had reddish bruising with swelling below the right eye, extending into the corner of the eye at the edge of the nasal bridge. He also had a abrasive injury ("blood blister") at the left corner of his mouth. Internally, there was a healing laceration on the inside of the upper lip, which matched the position of his lateral incisor. There were five, small yellow-brown bruises on the front of Daniel's chest, each roughly circular and about 3-5mm across. There were several healing bruises on his shins. John is a well-grown, well-developed 3 year old with appropriate fear of strangers. CT Page 435 His examination revealed nothing more than some healing bruises on his shins.
 Shin bruises are not indicative of child abuse. They are frequent findings in all children form the time they start walking, throughout the elementary school years. Therefore, there is little significance to the presence of these bruises on either Daniel or John or both.
 The other bruises seen on Daniel are more problematic. The "black eye" indicates forceful contact with a protruding, moderately sized object. Falling onto a flat surface would not have caused this bruise pattern, because something had to project past the initial contact point with the cheekbone, which protrudes. The most typical cause of such an injury is forceful contact with a fist, and the size of the bruise is compatible with this explanation. It is hard to conceive how a fall getting out of the bathtub could result in this bruise pattern. The lip injury could result from a fall, abrading the lip and causing the self-inflicted bite on the inside. However, this could not happen with a single incident which also caused the bruise around the right eye. Falling down, hitting the left side of the mouth, there is no way the right cheekbone can also be struck, with nothing hitting the nose which is protruding in between these two sites. If Daniel was struck in the eye, and subsequently fell, however, the lip injury could have resulted from him striking the ground. Bruises on the chest are unusual accidental injuries in childhood; when they occur, it is typically a single, relatively large bruise. Multiple small bruises all of a similar shape and size are unlikely to occur as the result of a fall. This bruising pattern is typical of fingertip, pressure bruising. All of these injuries are suggestive of a pattern of abusive behavior against Daniel.
 A skeletal survey was performed on Daniel and showed no new fractures and full healing of the previously noted clavicle fracture. Photographs were taken of his bruises by our hospital photographer Michael McCarter. No skeletal survey was done on John, because the information yield is small in children over age two, and negligible in children who are three or older.
You also informed me that when the prior investigation was ongoing in February 1997, [John, Sr.] had absconded with CT Page 436 John. Although there are no suspicious injuries which I see on John, this action makes me uncomfortable as to his safety under these circumstances. There appears to be a series of injuries which Daniel has sustained when he is in his father's {sic} care alone. The second set of these is highly suspicious for abusive etiology, which raises the probability that the first was inflicted as well. Absconding with one of the children, while an investigation is ongoing is even more worrisome, and subsequently, admitted lying to DCF about the cause of an injury makes me uncertain that either parent is in a position to protect these children.
 Thank you again for this interesting consult. Please let me know if I can be of any further help in this matter.
Sincerely yours,
(Signed) Betty S. Spivack, MD
While no evidence was offered to refute this disturbing conclusion, the pictures of Danny entered into evidence corroborate her conclusion and that conclusion is adopted by this Court.
While John, Sr. stated at trial that he was responsible for Danny's injuries, he did so by asserting that he shouted at Danny thereby frightening him into falling out of the bathtub. He has at no time acknowledged to anyone that his participation in the injury extended beyond this, even in the face of the evidence, including a statement by his son, Johnny, that John, Sr. became angry and hit Danny. This is his absolute right and he has asserted it. The Court, however, is charged primarily with the obligation to protect children. It cannot ignore evidence of abuse established beyond a fair preponderance and approaching if not attaining the "clear and convincing" level. The Court finds that the injuries Danny received were received at the hands of John, Sr. by aggressive physical action towards Danny. The Court does not believe that they were the sole result of an inadvertent fall from a bathtub.
The fact that John, Sr. has not acknowledged an active participation in the incident beyond shouting, is significant. He was evaluated by Dr. David Mantell, Ph.D. following the burn incident and again because of the instant case. At trial the credentials of Dr. Mantell were acknowledged and all parties CT Page 437 stipulated that he was an expert in his field, having testified as an expert in the courts of Connecticut innumerable times over many years. It is clear in Dr. Mantell's reports that John, Sr. has been less than forthcoming with him about his past, his family's past, and the incident involved in this case. After noting "a pattern of denial", he goes on to observe the following: (from States Exhibit 1B, Report of May 5, 1998, by Dr Mantell)
 "The impression he (John, Sr.) engenders is that of an overcontrolled, inhibited, and anxious person who cannot even admit normal range unpleasant reactions to aversive stimuli." Page 7.
 "His pattern of responses suggests obsessive-compulsive traits. He describes himself as an agreeable and submissive person who shows his feelings easily and quickly. These were not features of [John. Sr.'s] personality and behavior that have been apparent during assessment contact." Page 7.
 "[John, Sr. and Melissa] assert that there has been no abuse or neglect and therefore no treatment services are required to address such issues. I continue to have difficulty accepting the version of events that [John. Sr.] has offered. The medical reports indicate a pattern of abuse." Page 9.
 "The parents report satisfactory adjustment and generate low level clinical profiles. The father's pattern of emotional denial and avoidance is still in evidence though he is now admitting that he has some emotional reactivity and that anger management classes have been of some help to him. I am concerned about the misinformation the father gave me about the living situation of his parents and am troubled by the claim that a one year old child was asked to get out of a bathtub by himself and that the child would be capable of coming out of the tub `like a rocket.' It is the accident history and injuries to Daniel that raise concern about the ability of Melissa and John . . . to safely raise children and to discharge child care responsibilily. I do not consider this concern resolved." Page 9, 10.
"I think one would be necessarily alarmed by the version of events presented by [John, Sr.] which involve yelling at a child and scaring him in order to get him to remove himself from a wet bathtub onto a wet floor. Ordinary common sense CT Page 438 would require any adult to assist the child in leaving the tub. The alternative version is also worrisome. It is that [John, Sr.] hit the child. I have not seen these issues addressed in any of the treatment records provided for my review." Page 10.
In State's Exhibit 1E, Dr. Mantell's report of October 7, 1998, reviewing his conversation with John, Sr.'s therapist, Mr. Dan Dupuis, Dr. Mantell notes:
 Mr. Dupuis found [John, Sr.] guarded at first and states that DCF wanted him to admit that he had hit his stepson. In their treament, he found that [John, Sr.] admitted having lost his temper when the boy fell out of the tub. He has tried to break down that admission without success. Mr Dupuis told me that he has worked with many offenders who were guarded and defensive at first but he has been successful in breaking down their resistance over time. Mr. Dupuis said that this did not occur in the case of [John, Sr.] who did not provide any admissions of abuse though this issue was approached from many angles." Page 1.
Daniel Dupuis has a Masters degree in Social Work from Boston College. He practices psychotherapy at United Services and counseled John, Sr. beginning December 11, 1997. He established counseling goals for John, Sr. including stress management, anger management, expression of emotions, assertiveness skills and communication skills. He testified that he had not seen John, Sr. with Johnny and could not recommend Johnny's return to John, Sr. He also testified that deeper counseling might be helpful to John, Sr. He did not have an opinion as to whether John, Sr. hit Danny, expressing that he is not an investigator, although he saw the pictures and read the reports. While he testified to the gains John, Sr. was making in counselling, he never addressed the issue of Danny's safety in John's care in the future. He did not approach the therapy on the basis that John, Sr. did hit Danny since there was no admission but testified that it was not necessary to go into detail of past events even it John did hit Danny. No clinical explanation for this position was offered, nor was any refutation of Dr. Mantell's thesis offered.
Returning to Dr. Mantell's position:
"I [Dr. Mantell] am still troubled by the fact that two of the children have come to harm when under the care of CT Page 439 [John, Sr.] and the paternal grandmother, Paulette G. Each of these adults admits to having been angry at the child at the time that the injury occurred. If both of them claim that they undertook no aggressive acts against the children that resulted in those injuries.{Sic.} Both, instead, spoke of how the children themselves were out of control suggesting that in a way the children brought the injuries upon themselves." Page 2.
Dr. Mantell went on to testify at trial that he is troubled by the non-specific treatment Melissa and John, Sr. were receiving. He explained that since neither ever acknowledged any wrongdoing, any treatment will not address the real problems. In order to treat a problem, that problem must be identified. Then it can be treated. But when no problem is identified, one cannot trust any alleged treatment or progress. If there is acknowledgment of the problem, then it can be addressed and treated. To do so, the event must be described in painful detail, the lies must be addressed, prior injuries must be explored, a systematic look at family of origin must be pursued, and then all of the issues must be addressed in detail in therapy. No expert testified contrary to this thesis of Dr. Mantell. None of the requirements expostulated by Dr. Mantell happened in this case. Rather, John, Sr. was found by Dr. Mantell to be defensive, evasive on certain topics, and presented under very careful control. Dr. Mantell was bothered by his lack of detail and specificity in historical and autobiographical data.
While the fact that John, Sr. was arrested on felony charges as a result of this incident, which fact might well inhibit any forthright acknowledgment and treatment, such a reality, if that is the case, cannot affect the Court's ultimate charge to protect children. Whether the reason for denial is strategic or systemic, it is still denial, and no treatment can be forthcoming under such circumstances. In such an instance any child or children left with such an individual would be at risk.
The Court heard testimony about the prior instability in the life of Johnny's mother, Sue Ann H. and the concern this raised in Dr. Mantell's mind. Without question or hesitation, she admitted on the stand to having been involved consistently with abusive relationships, including that with John, Sr. and that at that time her life was chaotic. This is consistent with the findings of Dr. Mantell. However, she is addressing her issues in ongoing therapy and progress is being made. She is now involved CT Page 440 in a wholesome relationship of a year and a half duration and on July 23, 1998 she gave birth to a baby girl. The love, care and raising of this child has proceeded without incident. Her love for her child, Johnny, is also unquestioned. Dr. Mantell noted that Johnny desperately needs stability in his life, and that moving from foster home to foster home, including his paternal grandmother's from which he had to be removed, is at best counterproductive. This Court is satisfied that placing Johnny with his mother is in Johnny's best interest and that under the current circumstances he is safe in that environment. The Court believes that as a result of her ongoing therapy, Sue Ann H. has become aware of her psychological issues, is aggressively addressing them for her own good and fulfillment, and has created an environment for Johnny which is safe and will provide him with the stability he needs. It is the Order of this Court that the care, custody and guardianship of Johnny is transferred to mother, Sue Ann H.
There was evidence that during the time John, Sr. had Johnny in his care and custody, he may not have been as forthcoming as possible in communicating with Sue Ann and establishing visitation as he might have been. The testimony is vague about causation and lack of rectification of this problem. However, it is in Johnny's best interest to maintain a relationship with his father, and visitation by John, Sr. with Johnny at Sue Ann's residence is encouraged.
The order of this Court regarding John G. Jr., dated November 25, 1998 and recited above, granted visitation to John, Sr. two times per week totaling three hours per week supervised by Rhode Island DCF. A series of e-mail communications among DCF offices and workers in Connecticut indicate that Rhode Island DCF "did not give concurrence for CT DCF to discharge its jurisdiction in this case when RI-ICPC approved the mother as a placement resource for John in 8/98." Rhode Island DCF went on to affirm that it had no provisions to supervise the child's visitation with father without an open ICPC agreement. This issue, however, is rendered moot by the granting of guardianship to Sue Ann H., and the previous order regarding visitation is modified eliminating the provisions both for visitation and supervision. Visitation is to be determined by Sue Ann H. keeping in mind that she must at all times act in the best interest of Johnny and that best interest includes maintaining a relationship with his father. CT Page 441
The order relating to Daniel M. recited above remains unchanged.
These orders are found to be in the best interest of each child and to insure the security and safety of each child
Mack, J.